CTJ

FILED
December 16, 2019
KAREN MITCHELL
CLERK, U.S. DISTRICT COURT

REVISED November 25, 2019

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

4:18-CV-159-O

No. 18-11092

United States Court of Appeals
Fifth Circuit
**FILED**
November 22, 2019
Lyle W. Cayce
Clerk

KATHIE CUTRER,

    Plaintiff - Appellant,

v.

TARRANT COUNTY LOCAL WORKFORCE DEVELOPMENT BOARD,
doing business as Tarrant County Workforce Solutions;
INSPERITY INCORPORATED,

    Defendants - Appellees.

Appeal from the United States District Court
for the Northern District of Texas

Before WIENER, GRAVES, and OLDHAM, Circuit Judges.[*]

ANDREW S. OLDHAM, Circuit Judge:

    Kathie Cutrer worked for the Tarrant County Workforce Development Board d/b/a "Workforce Solutions" for 17 years. Workforce Solutions fired Cutrer six months before she would've been eligible for retirement. Cutrer sued for discrimination. Workforce Solutions says it's *basically* the State of Texas and hence enjoys state sovereign immunity. We disagree.

---

[*] Judges Wiener and Graves concur in the judgment only.

I.

The Texas Workforce Investment Act establishes a multi-tiered workforce development system. *See* TEX. GOV'T CODE §§ 2308.001–.403; *Arbor E & T, LLC v. Lower Rio Grande Valley Workforce Dev. Bd., Inc.*, 476 S.W.3d 25, 31 (Tex. App.—Corpus Christi 2013, no pet.). The top tier is the Texas Workforce Commission ("TWC"). TWC is "a state agency established to operate an integrated workforce development system in [Texas] . . . and to administer the unemployment compensation insurance program in [the] state." TEX. LAB. CODE § 301.001(a). The bottom tier is comprised of local workforce development boards, like Workforce Solutions. Such local boards "plan and oversee the delivery of workforce training and services," and "evaluate workforce development in [their respective] workforce development area[s]." TEX. GOV'T CODE § 2308.253(a).

Under Texas law, the political leaders in a "workforce development area" can agree to create a local workforce development board. *See ibid.* Here, the "workforce development area" is Tarrant County, Texas. In 1996, three local government leaders in Tarrant County—the mayor of Fort Worth, the mayor of Arlington, and the county judge of Tarrant[1]—agreed to create such a board. Today, that board does business as "Workforce Solutions." All or almost all of Workforce Solutions' employees are co-employed by a for-profit company called Insperity, Inc.

---

[1] The position of county judge is a remnant of Texas's time as part of Mexico. Title II, Section VII of the 1827 Constitution of the State of Coahuila and Texas established Ayuntamientos (town councils), charged with municipal administration. And under Article 159 of the 1827 Constitution, the council was to include "Alcades." "Alcade" is a Spanish term for a magistrate who performs both executive and judicial functions. Today, the county judge principally serves as the chief executive of a Texas county. *See* TEX. CONST. art. V, §§ 16, 18. But in keeping with the historical pedigree of the office, a county judge still performs some judicial functions. *See, e.g.*, TEX. EST. CODE § 1002.008(a)(1); TEX. HEALTH & SAFETY CODE §§ 571.012, 573.012.

Case: 18-11092   Document: 00515237134   Page: 3   Date Filed: 12/16/2019
Case 4:18-cv-00159-O   Document 26   Filed 12/16/19   Page 3 of 10   PageID 297

No. 18-11092

Workforce Solutions hired Cutrer on May 29, 2000. (It is unclear from the record whether Cutrer was co-employed by Insperity.) Sometime around August 22, 2000, Cutrer was injured in a car accident. Those injuries included a broken neck, which required multiple surgeries and a double spinal fusion. For a time, Workforce Solutions accommodated Cutrer's well-documented disabilities. It stopped doing so in 2016. The same year, Workforce Solutions and Cutrer's supervisor allegedly engaged in various acts of discrimination.

Then Workforce Solutions fired Cutrer. The parties agreed in writing to settle Cutrer's various complaints for $33,750. But, adding insult to injury, Workforce Solutions reneged on the settlement agreement, retroactively changed Cutrer's employment status from "voluntary termination" to "termination for poor job performance," and used her personal information in violation of the Fair Credit Reporting Act ("FCRA").

Cutrer sued both Workforce Solutions and Insperity for discrimination, retaliation, post-employment retaliation under the Americans with Disabilities Act ("ADA"), and for violations of the FCRA. Workforce Solutions moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) on the ground that it enjoys "sovereign immunity." The district court granted the motion. Cutrer timely appealed.[2]

## II.

Sovereign immunity has ancient origins. It dates at least as far back as Bracton in the thirteenth century. *See, e.g.*, 2 BRACTON, DE LEGIBUS ET CONSUETUDINIBUS ANGLIAE 33 (George Woodbine ed., Samuel Thorne trans.

---

[2] The district court also granted Insperity's motion to dismiss under Rule 12(b)(6). Cutrer's opening brief says nothing about Insperity. So her claims against Insperity are forfeited. *See United States v. Thibodeaux*, 211 F.3d 910, 912 (5th Cir. 2000) ("It has long been the rule in this circuit that any issues not briefed on appeal are [forfeited]."); *see also Melton v. Teachers Ins. & Annuity Ass'n of Am.*, 114 F.3d 557, 561 (5th Cir. 1997). We address only her claims against Workforce Solutions.

1968) (London 1569 ed., folio 5b, Bk. I, ch. 8); Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 HARV. L. REV. 1, 2 (1963) ("By the time of Bracton (1268) it was settled doctrine that the King could not be sued *eo nomine* in his own courts."). And it derives from the sovereignty of the King: "[T]he law ascribes to the king the attribute of *sovereignty*, or pre-eminence," which means he is "accountable to no man," and "no suit or action can be brought against [him], even in civil matters, because no court can have jurisdiction over him." 1 WILLIAM BLACKSTONE, COMMENTARIES *241–42; *see also* RICHARD H. FALLON, JR. ET AL., HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 877–80 (7th ed. 2015) [hereinafter HART & WECHSLER].

At our Nation's Founding, one of the Anti-Federalists' concerns was whether the States would enjoy sovereign immunity in the new Article III courts. The States were laboring under more than $200 million in Revolutionary War debt. That made the Anti-Federalists worry that the State-Citizen Clause in Article III, § 2 would allow out-of-state citizens to use the federal courts to sue States and collect the debts. For example, Brutus said the State-Citizen Clause was "improper, because it subjects a state to answer in a court of law, to the suit of an individual." Brutus XIII (Feb. 21, 1788), *in* 2 THE COMPLETE ANTI-FEDERALIST 429 (Herbert Storing ed. 1981). Federal Farmer was blunter:

> How far it may be proper to admit a foreigner or the citizen of another state to bring actions against state governments, which have failed in performing so many promises made during the war, is doubtful: How far it may be proper so to humble a state, as to bring it to answer to an individual in a court of law, is worthy of consideration; the states are now subject to no such actions, and this new jurisdiction will subject the states, and many defendants to actions, and processes, which were not in the contemplation of the parties, when the contract was made; all engagements existing

4

> between . . . states and citizens of other states were made [with] the parties contemplating the remedies then existing on the laws of the states—and the new remedy proposed to be given in the federal courts, can be founded on no principle whatever.

Letters from the Federal Farmer III (Oct. 10, 1787), *in* 2 THE COMPLETE ANTI-FEDERALIST, *supra*, at 245.

As with so many of the Anti-Federalists' concerns, Hamilton tried to dismiss this one as "a supposition which has excited some alarm upon very mistaken grounds." THE FEDERALIST NO. 81, at 487 (Alexander Hamilton) (Clinton Rossiter ed., 1961). And Hamilton insisted the federal courts wouldn't *dare* entertain individuals' suits against the States: "It is inherent in the nature of [a State's] sovereignty not to be amenable to the suit of an individual *without its consent.*" *Ibid.* It took less than five years to prove Hamilton wrong. *See Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793).

That's how we got the Eleventh Amendment. *Principality of Monaco v. Mississippi*, 292 U.S. 313, 325 (1934) (noting the *Chisholm* "decision created such a shock of surprise that the Eleventh Amendment was at once proposed and adopted"). That Amendment prohibits an individual from suing a *foreign* state in federal court (as Chisholm had). Shortly after Congress gave the courts federal question jurisdiction in 1875, the Supreme Court held that sovereign immunity also prohibits an individual from suing his *home* state in federal court. *See Hans v. Louisiana*, 134 U.S. 1 (1890). From *Hans* to today, the Supreme Court has extended a broad host of immunities to States haled into federal court. *See, e.g., Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67–72 (1996); *Monaco*, 292 U.S. at 329–30.[3]

---

[3] The text of the Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend XI. That text says nothing about a suit brought by a citizen against her home state. *See, e.g.*, William Baude, *Sovereign Immunity and the Constitutional*

5

But on the very same day the Court decided the canonical *Hans* case, it emphasized that state sovereign immunity does not protect a *political subdivision* of the State. *See Lincoln County v. Luning*, 133 U.S. 529 (1890). In that case, a federal court rendered judgment against a county and forced it to honor certain bonds and coupons. That's the very thing Brutus and Federal Farmer worried federal courts would do to *States* under Article III. But *Lincoln County* held that only the State is immune from suit in federal court:

> [W]hile the county is territorially a part of the state, yet politically it is also a corporation created by, and with such powers as are given to it by, the state. In this respect, it is a part of the state only in that remote sense in which any city, town, or other municipal corporation may be said to be a part of the state.

*Id.* at 530. The same rule has endured ever since. *See* HART & WECHSLER, *supra*, at 921.

*Lincoln County* makes this an open-and-shut case: Because Tarrant County, the City of Arlington, and the City of Fort Worth are not the State of Texas, they obviously cannot confer the State's sovereign immunity upon a board by interlocal agreement. They can't give what they don't have.

### III.

Workforce Solutions nonetheless insists it should be treated like the sovereign State of Texas—even though it's in no sense the sovereign. It rests

---

*Text*, 103 VA. L. REV. 1, 6–7 (2017); John F. Manning, *The Eleventh Amendment and the Reading of Precise Constitutional Texts*, 133 YALE L.J. 1663, 1666 (2004). But a long line of precedent holds that "the Eleventh Amendment accomplished much more: It repudiated the central premise of *Chisholm* that the jurisdictional heads of Article III superseded the sovereign immunity that the States possessed before entering the Union." *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 669 (1999); *see also Alden v. Maine*, 527 U.S. 706, 736 (1999) ("[T]he bare text of the Amendment is not an exhaustive description of the States' constitutional immunity from suit."). That immunity extends to States haled into *state* courts, *see Alden*, 527 U.S. at 759–60, and federal *non-courts* (like administrative agencies), *see Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 747 (2002).

6

that counterintuitive argument on the so-called "*Clark* factors," which derive from our decision in *Clark v. Tarrant County*, 798 F.2d 736 (5th Cir. 1986). Here too Workforce Solutions falls far short.

In *Clark*, we held that sovereign immunity applies not only to the State itself but also to "an arm of the state." *Id.* at 744. Then we identified six "factors" that influence our determination of whether something is an "arm of the state." *Ibid.* Those "factors" are:

> (1) "whether the state statutes and case law view the [entity] as an arm of the state";
>
> (2) "the source of the entity's funding, since an important goal of the Eleventh Amendment is the protection of state treasuries";
>
> (3) "the entity's degree of local autonomy";
>
> (4) "whether the entity is concerned primarily with local, as opposed to statewide, problems";
>
> (5) "whether the entity has the authority to sue and be sued in its own name"; and
>
> (6) "whether [the entity] has the right to hold and use property."

*Id.* at 744–45. No factor or combination of them is necessary. None is sufficient. And *Clark* says nothing about how to "balance" them. As Justice Scalia once pointed out in similar circumstances, "the scale analogy is not really appropriate, since the interests on both sides are incommensurate. It is more like judging whether a particular line is longer than a particular rock is heavy." *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring in judgment). Such "tests" have all the precision of a blunderbuss.

Still, we've made two things clear. First, an entity that asserts sovereign immunity under *Clark* bears the burden of demonstrating that it's an "arm of the state." *See, e.g.*, *Skelton v. Camp*, 234 F.3d 292, 297 (5th Cir. 2000) (collecting cases). And second, *Clark*'s money factor deserves "the most

7

weight." *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 596 (5th Cir. 2006). So we've given Workforce Solutions multiple opportunities to carry its burden.[4] And we've endeavored at length to identify where Workforce Solutions would get the money to pay an adverse judgment in this case. That endeavor has been frustrating, to put it mildly.

In its brief on the merits, Workforce Solutions insists it is "*wholly* dependent on public funding." But it doesn't specify that "public funding" means *state* funds (as opposed to, say, local funds). And Workforce Solutions' annual report suggests it receives $486,185 in "Other Fund Sources" that are not tethered to any public fisc (federal, state, or local).

Workforce Solutions also relies upon a declaration from its general counsel. The declaration says: "Any judgment against Workforce Solutions could put funds from the state treasury at risk." That's a bold claim. And you might wonder how or why it's true. Unfortunately, the general counsel does not elaborate. And it's not self-evident from the record how or why a judgment against a local board formed by interlocal agreement could or would be passed through to the State. Workforce Solutions concedes the State appropriates zero dollars directly to it or any other local development board. Workforce Solutions

---

[4] Workforce Solutions moved to dismiss Cutrer's complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and it contends *Cutrer* bears the burden of proving Workforce Solutions is not entitled to sovereign immunity. It's unclear whether and to what extent the Eleventh Amendment deprives a federal court of subject-matter jurisdiction to hear a case that arises under a federal statute. *Compare* Caleb Nelson, *Sovereign Immunity as a Doctrine of Personal Jurisdiction*, 115 HARV. L. REV. 1559, 1615–17 (2002) (arguing that the Eleventh Amendment deprives federal courts of subject-matter jurisdiction only over diversity cases against States, and that sovereign immunity should be available as a personal-jurisdiction defense in all other cases), *with* Lawrence C. Marshall, *Fighting the Words of the Eleventh Amendment*, 102 HARV. L. REV. 1342, 1347 (1989) (arguing that the Eleventh Amendment stripped the courts of the power to hear all suits between the categories of parties listed in the Amendment, including those cases relying on federal-question jurisdiction). Regardless of which party bears the burden, however, Workforce Solutions is not entitled to sovereign immunity for the reasons explained below.

does not identify a single instance in the past where the State appropriated more than zero dollars to pay a judgment against a local board. Nor does Workforce Solutions explain how or why the State would or could do so in the future.

Given these ambiguities, we gave Workforce Solutions a final opportunity to explain its avowed entitlement to sovereign immunity. After argument, we asked for a supplemental brief explaining, *inter alia*, where Workforce Solutions would get the money to pay a judgment for Cutrer. Workforce Solutions filed a supplemental brief. But again, it raises more questions than it answers. For example, Workforce Solutions says: "*Potential* funding sources to pay an adverse judgment *might* include: A special appropriation of the Texas Legislature; or Execution on the judgment by the judgment-creditor-plaintiff on local bank accounts maintained by the Board." (emphases added). Might they include something else? What basis is there for speculating that they include these two potentialities? Heaven only knows.

All of this is made more bewildering by the fact that Workforce Solutions previously agreed in writing to pay Cutrer $33,750. Where did it plan to get that money? If all of its money somehow really belongs to the State of Texas, did the State have to agree to that payment? And regardless, what law would give Workforce Solutions the power to move its purportedly public money from the State treasury to Cutrer's bank account in the absence of a judgment? Again, Workforce Solutions won't say.[5] "It is a riddle, wrapped in a mystery,

---

[5] Workforce Solutions simply insists the State would, if necessary, readily pay a judgment or settlement in this case. But, as far as we know, that's not how Texas government works. The General Appropriations Act requires every penny that leaves the State treasury to be spent according to authorized purposes. *See* GENERAL APPROPRIATIONS ACT, 85th Leg., R.S., art. IX-1, § 1.01, Legislative Intent ("It is the purpose of the Legislature in enacting this bill only to appropriate funds and to restrict and limit by its provisions the amount and conditions under which the appropriations can be expended."). Judgments and settlements are no exception. *See id.*, art. IX-77, § 16.04, Judgments and Settlements. For one, both the Governor

9

inside an enigma." Winston Churchill, *The Russian Enigma* (BBC Broadcast, Oct. 1, 1939).

But when it comes to satisfying a burden of proof, enigmas won't cut it. A local board cannot invoke the ancient and august protections reserved to the sovereign while steadfastly refusing to explain or identify how or why a money judgment *would in fact* affect the sovereign. A party cannot carry its burden of proof with equivocation and obfuscation.

\* \* \*

Workforce Solutions is not the State of Texas. It's a local board in Tarrant County. We suppose it's possible that judgments against such a local entity could implicate the State's treasury. But it's not possible for such a local entity to hide behind sovereign immunity when its briefs and the record reveal no basis for it. If Workforce Solutions wants to be treated like the State of Texas, it must explain why it *is* (for present purposes) the State of Texas.

The judgment of the district court is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

---

and the Attorney General must authorize the payment. *Id.* § 16.04(b)(1). And the Attorney General must be satisfied that there was a valid "waiver of sovereign immunity or [a] legislative resolution granting [the] litigant permission to sue." *Id.* § 16.04(e)(8). We have no evidence that the Attorney General approved the later-withdrawn settlement with Cutrer, or that any state official thinks Workforce Solutions is entitled to pay its judgments with appropriated funds. If there's another way to pay the settlement with the State's money, again, Workforce Solutions doesn't tell us.